# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

| | | |
|---|---|---|
| ELTON NANCE, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | Civ. No. 08-1272-JDT-egb |
| VS. | ) | Crim. No. 04-10038-2-JDT |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

---

ORDER DENYING MOTION FOR FREE TRANSCRIPTS AS MOOT
ORDER GRANTING MOVANT'S MOTION TO SUPPLEMENT
ORDER ADOPTING REPORT AND RECOMMENDATION
ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255
ORDER GRANTING A LIMITED CERTIFICATE OF APPEALABILITY
ORDER CERTIFYING AN APPEAL WOULD BE TAKEN IN GOOD FAITH
AND
ORDER GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

---

On October 31, 2008, Movant Elton Nance, Bureau of Prisons inmate registration number 19652-076, an inmate at the Federal Correctional Institution in Memphis, Tennessee, filed a *pro se* motion pursuant to 28 U.S.C. § 2255, accompanied by a legal memorandum. (Docket Entry 1.) Movant filed an amended motion on March 5, 2009. (D.E. 4.) On April 14, 2009, United States District Judge J. Daniel Breen issued an order that, *inter alia*, granted leave to amend and directed the Government to respond. (D.E. 5.) On June 4, 2009, the Government filed an answer to the § 2255 motion. (D.E. 9.)[1] Movant filed a reply on December 11, 2009. (D.E. 16.)

---

[1] The case was reassigned to the undersigned judge on July 1, 2009. (D.E. 10.)

On June 23, 2010, Nance filed a motion pursuant to 28 U.S.C. § 753(f) in which he seeks free copies off the voir dire transcripts in his criminal case in order that he might investigate an additional issue involving a prospective juror. (D.E. 17.) A subsequent filing establishes that Movant obtained the requested transcript (D.E. 18-1); therefore, this motion is DENIED as moot.

On December 15, 2010, Movant filed a motion to supplement his § 2255 motion to raise an additional issue. (D.E. 18.) For cause shown, that motion is GRANTED.

In an order issued on March 26, 2012, the Court referred the case to the magistrate judge for appointment of counsel and an evidentiary hearing on one issue. (D.E. 20.) On May 14, 2012, the Court directed the Government to file a supplemental answer addressing the affidavits submitted in Movant's reply that stated that he lived at 228 Shelby Street in Jackson, Tennessee. (D.E. 27.) The Government filed its supplemental response on May 29, 2012. (D.E. 29.)

After it was determined that Movant was indigent and qualified for appointed counsel (D.E. 28), an attorney was duly appointed to represent him. (D.E. 30.) United States Magistrate Judge Edward G. Bryant, Jr. conducted an evidentiary hearing on October 3, 2012. (D.E. 46 & 49.) Magistrate Judge Bryant issued a Report and Recommendation (the "R&R") on December 26, 2012, recommending that relief be denied on the issue that was referred. (D.E. 52.) Movant filed timely objections to the R&R on January 8, 2013 (D.E. 54), and the Government filed a response to the R&R on January 15, 2013 (D.E. 55).

On April 19, 2004, a federal grand jury in this district returned a four-count indictment against Nance and a co-defendant, Martedis McPhearson.  <u>United States v. Nance</u>, No. 04-10038-2-JDT (W.D. Tenn.) (Cr. D.E. 1).  The grand jury returned a superseding indictment on September 23, 2004 to correct a typographic error.  (Cr. D.E. 32.)  On November 15, 2004, the grand jury returned a seven-count second superseding indictment.  (Cr. D.E. 54.)  Nance was named in Counts 4, 6, and 7.  Count 4 charged that, on or about December 12, 2003, McPhearson and Nance, aided and abetted by each other, possessed approximately 4.9 grams of cocaine base (crack cocaine) with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  Count 6 charged Nance, a convicted felon, with possession of a firearm on or about December 12, 2003, in violation of 18 U.S.C. § 922(g).  Count 7 charged McPhearson and Nance, aided and abetted by each other, with using and carrying a firearm during and in furtherance of the drug-trafficking crime charged in Count 4, in violation of 18 U.S.C. §§ 924(c)(1)-(2) and 2.

The factual basis for these charges is set forth in the presentence report ("PSR"):

3.      At approximately 3:05 p.m. on December 12, 2003, Officer C. Mathis and Investigator Chris Wiser of the Jackson Police Department (JPD) went to the home of Martedis McPhearson, located at 228 Shelby Street, Jackson, TN, for the purpose of arresting Mr. McPhearson on an outstanding warrant for Assault.  Mr. McPhearson answered the officer's knock on the door and then stepped onto the front porch of the residence.  Mr. McPhearson correctly identified himself to the officers and was immediately taken into custody on the outstanding warrant.  During a post-arrest "pat-down", Investigator Wisor discovered a plastic baggie containing what was later determined by TBI Crime Laboratory analysis to be 4.9 grams of crack cocaine in Mr. McPhearson's right front pants pocket.  The substance field-tested positive for the presence of cocaine.  Based on the results of the field test, officers obtained a search warrant for Mr. McPhearson's residence.

4.    During the December 12, 2003, execution of the search warrant at 228 Shelby Street, JPD officers discovered that there were three (3) persons present in that residence. A male subject, later identified as the defendant, Elton Nance, Jr., was found in the bathroom of the residence. The officers brought the as-yet unidentified male subject out of the bathroom into the living room of the home. When asked about his identity, Mr. Nance falsely identified himself as Marcus Powell. He also provided the officers with a false social security number and date of birth. After officers had obtained a picture of the real Marcus Powell, the defendant admitted that his true name was Elton Nance. The defendant advised that he had used the name of Marcus Powell, whom he said was a victim of one of his prior offenses, because he thought that there was a warrant for him. A computer check confirmed revealed [sic] that Mr. Nance did have an outstanding Jackson City Court warrant for a misdemeanor vandalism charge. Officers then placed Mr. Nance under arrest on the outstanding warrant. Officers also found two (2) females, Ebony Donald (later identified as Mr. Nance's girlfriend) and Pauline Timms, in the home. Ms. Donald was arrested on an outstanding warrant for Criminal Trespass. Pauline Timms was released without charges.

5.    During the warrant search, officers found a small, locked safe in a middle bedroom of the residence. When asked by one of the officers if he knew which of several keys which they had found might go to the safe, Mr. Nance responded by correctly identifying the key which ultimately unlocked the safe. Inside the safe, officers found a firearm, identified as a Husqvarna, .380 caliber semiautomatic pistol, serial #68986. The weapon was loaded with four (4) .380 caliber cartridges in the magazine. An additional six (6) .380 caliber cartridges were found in the living room of the residence. A small amount of marijuana (21.9 grams) was also found in the home.

6.    Subsequent to his arrest, Mr. Nance, after being Mirandized, voluntarily gave a signed and witnessed statement to JPD Lt. Patrick Wills and former JPD Officer A. Willis. In his statement, Mr. Nance admitted that, on the Monday prior to his arrest, he was at Martedis McPhearson's residence when there was a knock at the door. According to the defendant's statement, a female who was also in the home asked Mr. Nance to "put up" a black automatic weapon (the same weapon found by officers during the warrant search) before she answered the door. Mr. Nance responded by picking up the firearm, at which time he discovered that the safety was not engaged. When he reportedly tried to engage the safety, the magazine fell out of the weapon, with two (2) bullets falling out of the magazine. After placing the bullets back into the magazine and the magazine back into the weapon, Mr. Nance

reportedly placed the firearm into the "box" (safe). The defendant admitted that his fingerprints would be on that firearm. Mr. Nance specifically denied any knowledge of the marijuana which was found in the residence. He also denied any involvement in crack cocaine trafficking and any knowledge of such activity by Mr. McPhearson.

7.    A check of Mr. Nance's criminal history revealed that he is a convicted felon, having been previously convicted of the following felony offenses:

| Offense of Conviction | Date of Conviction | Court/ Dkt. No. |
|---|---|---|
| Aggravated Burglary | 06/19/95 | Humboldt Law Ct. (# 6396) |
| Theft Over $1,000 | 05/20/96 | Humboldt Law Ct. (#6478) |
| Forgery | 05/20/96 | Humboldt Law Ct. (#6478) |
| Theft Over $1,000 | 05/20/96 | Gibson Co. Circuit Ct. (#15255) |
| Facilitating Aggravated Robbery | 05/27/03 | Madison Co. Circuit Ct. (#02-688) |

8.    On December 18, 2003, ATF Special Agent Alan B. Oxley examined the Husqvarna .380 caliber pistol seized from Mr. McPhearson's residence on December 12, 2003. Special Agent Oxley determined that the firearm in question was manufactured outside of the State of Tennessee, and therefore, at some point had traveled in interstate and/or foreign commerce. Special Agent Oxley also test-fired the weapon and found it to be in operable condition.

(PSR ¶¶ 3-8.)

On November 15, 2004, McPhearson filed a motion to suppress evidence obtained during the search of his home. (Cr. D.E. 53.) The Government filed its response on

December 21, 2004. (Cr. D.E. 65.) At a hearing on the suppression motion on February 11, 2005, the Court granted the Government's motion to sever the cases of the two defendants for trial. At the conclusion of the hearing, the Court granted McPhearson's motion to suppress the fruits of the search. (Cr. D.E. 79.) An order to that effect was issued on February 11, 2005. (Cr. D.E. 81.) The Government appealed the granting of the suppression motion, and the Sixth Circuit Court of Appeals affirmed. United States v. McPhearson, 469 F.3d 518 (6th Cir. 2006).

The case against Nance went to trial on February 14, 2005. (Cr. D.E. 83.) On February 15, 2005, the jury returned a guilty verdict on Count 6 of the second superseding indictment. (Cr. D.E. 85.) At a sentencing hearing on June 15, 2005, the Court sentenced Nance as an armed career criminal to a 235-month term of imprisonment, to run consecutive to an undischarged state judgment and to be followed by a three-year period of supervised release. (Cr. D.E. 113.)[2] Judgment was entered on June 21, 2005. (Cr. D.E. 116 & 126.) The United States Court of Appeals for the Sixth Circuit affirmed. United States v. Nance, 481 F.3d 882 (6th Cir. 2006), cert. denied, 552 U.S. 1052 (2007).

---

[2] Pursuant to § 2K2.1(a)(2) of the United States Sentencing Guidelines, the base offense level for unlawful possession of a firearm is 24 where a defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions for crimes of violence. There were no adjustments to that base offense level. Given Nance's criminal history category of VI, the guideline sentencing range was 100-125 months.

However, because he had four prior qualifying convictions for violent felonies, Nance was sentenced as an armed career criminal pursuant to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), and U.S.S.G. § 4B1.4. As a result, pursuant to U.S.S.G. § 4B1.4(b)(3)(B), Nance's base offense level was 33. The total offense level was also 33. Given his criminal history of VI, the guideline sentencing range was 235-293 months. Nance was also subject to a mandatory minimum sentence of 15 years, or 180 months, pursuant to 18 U.S.C. § 924(e)(1).

In his original § 2255 motion, Nance raises the following issues:

1.    Whether defense counsel rendered ineffective assistance, in violation of the Sixth Amendment, by failing to file a motion to suppress and by failing to raise the suppression issue on direct appeal;[3] and

2.    Whether he is entitled to relief from his sentence under the ACCA on the basis of the Supreme Court's decision in <u>Begay v. United States</u>, 553 U.S. 137 (2008), and the decision in <u>United States v. Mason</u>, 284 F.3d 555 (4th Cir. 2002).

(D.E. 1 at 4-7; D.E. 1-2.)

In his amendment, which was filed on March 5, 2009, Nance raises the following issues:

3.    Whether trial counsel rendered ineffective assistance when he failed to investigate whether Movant's prior juvenile convictions counted as predicate offenses under the ACCA; and

4.    Whether trial counsel rendered ineffective assistance when he failed to argue that use of his prior juvenile convictions under the ACCA was contrary to <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).

(D.E. 4.)[4]

In his supplement, which was filed on December 15, 2010, Nance raises the following, additional issue:

5.    Whether his lawyer rendered ineffective assistance by failing to use a peremptory challenge on a prospective juror who had previously dated the prosecuting attorney.

(D.E. 18.)

---

[3] Nance raised this issue as Issues 1 and 3. (D.E. 1 at 6, 7.) The Court has consolidated these issues.

[4] Nance also raised another challenge to his attorney's failure to file a motion to suppress.

Pursuant to 28 U.S.C. § 2255(a),

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." Short v. United States, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).

A § 2255 motion is not a substitute for a direct appeal. *See* Sunal v. Lange, 332 U.S. 174, 178 (1947). "[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." Stone v. Powell, 428 U.S. 465, 477 n.10 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." Grant v. United States, 72 F.3d 503, 506 (6th Cir. 1996). This rule is not absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a "complete miscarriage of justice," it seems to us that what is really being asserted is a violation of due process.

Id.

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise those issues previously. El-Nobani v. United States, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); Peveler v. United States, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); Phillip v. United States, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating his "actual innocence." Bousley v. United States, 523 U.S. 614, 623 (1998).

"[A] § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." Jones v. United States, 178 F.3d 790, 796 (6th Cir. 1999); *see also* DuPont v. United States, 76 F.3d 108, 110 (6th Cir. 1996) (same).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings ("§ 2255 Rules"). "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." Id. The movant is entitled to reply to the Government's response. § 2255 Rule 5(d). The Court may also direct the parties to provide additional information relating to the motion. § 2255 Rule 7.

"In reviewing a § 2255 motion in which a factual dispute arises, 'the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.'" Valentine v. United States, 488 F.3d 325, 333 (6th Cir. 2007) (quoting Turner v. United States, 183 F.3d 474, 477 (6th Cir. 1999)). "'[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Id. (quoting Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999)). Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his or her recollection of the prior case. Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996); *see also* Blackledge v. Allison, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion."). Movant has the burden of proving that he is entitled to relief by a preponderance of the evidence. Pough v. United States, 442 F.3d 959, 964 (6th Cir. 2006).

In his second issue, Nance argues that he is entitled to relief from his sentence as an armed career criminal on the basis of the Supreme Court's decision in Begay v. United States, 553 U.S. 137 (2008), and the decision in United States v. Mason, 284 F.3d 555 (4th Cir. 2002). (D.E. 1 at 5-6; D.E. 1-2 at 7-9.)[5]

---

[5] For the sake of clarity, the Court will address Claims 2-5 before turning to Claim 1, which was the subject of the evidentiary hearing.

Nance was sentenced under the ACCA, which provides as follows:

> In the case of any person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

18 U.S.C. § 924(e)(1). The term "violent felony" is defined in the ACCA as

> any crime punishable by imprisonment exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed as an adult, that —
>
> (i)      has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii)     is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

Id. § 924(e)(2)(B).

The prior convictions used to qualify Nance as an armed career criminal were (i) a 1991 juvenile adjudication for two counts of robbery in the Juvenile Division of the Circuit Court for Elkhart, Indiana (PSR ¶ 22);[6] (ii) a 1995 conviction for aggravated burglary obtained in the Humboldt Law Court in Gibson County, Tennessee (id. ¶ 24); and (iii) a 2003 conviction for facilitating aggravated robbery obtained in the Circuit Court for Madison County, Tennessee (id. ¶ 30).

---

[6] The robberies, which were committed on January 7, 1991, and January 9, 1991, were counted as two predicate convictions.

Nance challenged his sentence as an armed career criminal on direct appeal, and the

Sixth Circuit rejected his arguments on the merits, stating as follows:

> Nance next challenges the district court's application of the armed career criminal enhancement. This court reviews *de novo* a district court's determination that a defendant should be sentenced as an armed career criminal. United States v. Sawyers, 409 F.3d 732, 736 (6th Cir. 2005). Under the advisory sentencing guidelines, the minimum offense level for an armed career criminal is 33. *See* U.S.S.G. § 4B1.4(a), (b)(3)(B). A person possessing a firearm after three prior convictions for serious drug offenses or violent felonies is an armed career criminal under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). *See* Shepard v. United States, 544 U.S. 13, 15, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005). The district court found that Nance had four prior violent felonies as listed in his PSR: two armed robberies, one aggravated burglary, and one facilitation of armed robbery. Nance does not dispute the two armed robberies; he does, however, challenge the district court's reliance on the other two prior felonies.

> With regard to the aggravated burglary conviction, Nance claims that the government failed to adequately prove the existence of this prior violent felony. At the outset, it is important to note that the ACCA "makes burglary a violent felony only if committed in a building or enclosed space ('generic burglary'), not in a boat or motor vehicle." Shepard, 544 U.S. at 15-16, 125 S. Ct. 1254. In Shepard, the Court clarified what evidence might be considered when a court analyzes whether a plea of guilty to a nongeneric burglary statute necessarily admitted elements of the generic offense, thereby satisfying the ACCA's generic-burglary requirement. Id. at 26, 125 S. Ct. 1254. On appeal, Nance claims that, under Shepard, the district court should not have considered the PSR's presentation of his aggravated burglary conviction. Nance does not contest, however, that Shepard only applies to nongeneric burglary statutes. Nance argues, albeit without citing any authority, that Tennessee has a nongeneric aggravated burglary statute. In fact, the weight of authority indicates that Tennessee's aggravated burglary statute is generic. The Supreme Court in Shepard reaffirmed "that a court sentencing under the ACCA could look to statutory elements . . . to determine whether an earlier conviction after trial was for generic burglary." Id. at 16, 125 S. Ct. 1254. Therefore, turning to the statutory elements of Tennessee's aggravated burglary statute, this court has previously said that "[a]ggravated burglary occurs when an individual enters a habitation 'without the effective consent of the property owner' and, . . . intends to commit a felony. . . ." Sawyers, 409

F.3d at 737 (quoting State v. Langford, 994 S.W.2d 126, 127 (Tenn. 1999) (citing Tenn. Code Ann. §§ 39-14-402 and 39-14-403)). Thus, aggravated burglary in Tennessee clearly comports with Shepard's definition of a generic burglary as "committed in a building or enclosed space." In short, Tennessee aggravated burglary represents a generic burglary capable of constituting a violent felony for ACCA purposes.

      With regard to the facilitation of armed robbery conviction, Nance argues that this is not a violent felony because (1) facilitation under Tennessee law is a separate, complete offense independent from a robbery offense;[7] (2) the independent offense of facilitation does not require criminal responsibility for the underlying robbery offense; and therefore, (3) facilitation cannot be considered a violent felony. This court rejected the same argument in the context of facilitation of aggravated burglary in Sawyers. See Sawyers, 409 F.3d at 737-40 (reasoning that the underlying felony constitutes "an element" that can be examined by the court because criminal facilitation in Tennessee requires the government to show that the underlying crime actually occurred). In Sawyers, the court held "that facilitation of aggravated burglary was, categorically, a violent felony under the ACCA." Id. at 740. The reasoning of Sawyers applies with even greater force to the crime of facilitation of armed robbery. See Tenn. Code Ann. § 39-13-401 ("Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear."). Nance's challenges to the district court's treatment of aggravated burglary and facilitation of armed robbery fail.

United States v. Nance, 481 F.3d at 886-88.

      Nance acknowledges that the Court of Appeals affirmed his sentence, but asserts that that determination can be revisited because of the Supreme Court's subsequent decision in Begay v. United States, 553 U.S. 137 (2008). (D.E. 1 at 5 (referring to "Substantial Change In Law By The Supreme Court"); D.E. 1-2 at 7.) In Begay, 553 U.S. at 142, the Supreme Court held that clause (ii) of § 924(e)(2)(B) does not include all crimes that "present[] a

---

[7] In a footnote, the Court of Appeals stated that "[u]nder Tennessee law, 'A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility [for the offense,] . . . the person knowingly furnishes substantial assistance in the commission of the felony.'" United States v. Nance, 481 F.3d at 888 n.3 (quoting Tenn. Code Ann. § 39-11-403(a)).

serious potential risk of physical injury to another."  Instead, "the examples in clause (ii) limit the scope of the clause to crimes that are similar to the examples themselves."  Id. at 143; *see also* id. at 143-44 ("Congress sought to . . . include both crimes against the person (clause (i)) and certain physically risky crimes against property (clause (ii)).").  Applying these principles, the Supreme Court held that New Mexico's crime of driving under the influence ("DUI") is not a violent felony within the meaning of clause (ii).  Id. at 144-47.  The Court explained that, in contrast to DUI, "[t]he listed crimes all typically involve purposeful, violent, and aggressive conduct.  That conduct is such that it makes more likely that an offender, later possessing a gun, will use that gun deliberately to harm a victim."  Id. at 144-45 (internal quotation marks omitted).

Although Nance repeats the arguments he presumably made on direct appeal about the Government's failure adequately to prove the convictions for aggravated burglary (D.E. 1-2 at 7-8) and facilitation of armed robbery (id. at 8-9), the Court of Appeals has held that Begay does not undermine its holdings that Tennessee convictions for aggravated burglary and facilitation of armed robbery are properly counted as violent felonies under the ACCA. *See* United States v. Ghoston, ___ F. App'x ___, 2013 WL 3766659 (6th Cir. 2013) (per curiam) (attempted aggravated burglary), *pet. for cert. filed* (U.S. Aug. 12, 2013) (No. 13-5985); United States v. Fraker, 458 F. App'x 461, 464 (6th Cir. 2012) (affirming sentence under the ACCA "[b]ecause the district court correctly found that Fraker's robbery and two counts of aggravated burglary convictions were predicate offenses under the ACCA"); United States v. Gloss, 661 F.3d 317, 319-20 (6th Cir. 2011) (facilitation of aggravated

burglary is a violent felony within § 924(e)(2)(B)(i)), *cert. denied,* ___ U.S. ___, 132 S. Ct. 1777 (2012).

Nance's reliance on the Fourth Circuit's decision in <u>United States v. Mason</u>, 284 F.3d 555 (4th Cir. 2002), which held that juvenile convictions cannot be used as predicate offenses to sentence a defendant as a career offender, is misplaced. Nance was not sentenced as a career offender. Instead, he was sentenced under the ACCA, which allows consideration of certain juvenile offenses.

The second issue is without merit and does not entitle Nance to relief.

In his third issue, Nance contends that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, when he failed to investigate whether his prior juvenile convictions counted as predicate offenses under the ACCA. (D.E. 4 at 4-6.)

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [<u>Strickland</u>, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' <u>Id.</u>, at 687, 104 S. Ct. 2052." <u>Harrington v. Richter</u>, ___ U.S. ___, 131 S. Ct. 770, 787 (2011).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.[8] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [Strickland, 466 U.S.] at 693, 104 S. Ct. 2052. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' Id., at 687, 104 S. Ct. 2052." Richter, 131 S. Ct. at 787-88; see also id. at 791-92 ("In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable." (citations omitted)); Wong v. Belmontes, 558 U.S. 15, 27, 130 S. Ct. 383, 391-92 (2009) (per curiam) ("But Strickland does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different."). Where, as here, a defendant contends that his attorney rendered ineffective assistance at a sentencing hearing, prejudice is established where a misapplication of the sentencing guidelines increased a defendant's sentence. Glover v. United States, 531 U.S. 198, 202-04 (2001).

---

[8] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id. at 697.

"Surmounting <u>Strickland</u>'s high bar is never an easy task."  <u>Padilla v. Ky.</u>, 559 U.S. 356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. <u>Strickland</u>, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence."  <u>Id.</u>, at 689, 104 S. Ct. 2052; *see also* <u>Bell v. Cone</u>, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993).  The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.  <u>Strickland</u>, 466 U.S., at 690, 104 S. Ct. 2052.

<u>Richter</u>, 131 S. Ct. at 788.

"A crime committed by a juvenile (an act of juvenile delinquency) can also constitute a violent felony, but only if, in addition to meeting the qualifications of an adult predicate offense, it also 'involv[es] the use or carrying of a firearm, knife, or destructive device.'"

<u>United States v. Davis</u>, ___ F. App'x ___, 2013 WL 4054919, at *6 (6th Cir. 2013) (quoting 18 U.S.C. § 924(e)(2)(B)).

> A sentencing court applies a "categorical" approach to determine the nature of a prior conviction, which means that it focuses on the statutory definition of the offense, rather than the manner in which an offender may have violated the statute in a particular circumstance.  <u>Sykes v. United States</u>, ⸺ U.S. ⸺, 131 S. Ct. 2267, 2272, 180 L. Ed.2d 60 (2011).  Even when there is "little doubt" that the circumstances of a defendant's violation were violent, "the question is whether [the statute he violated], as a categorical matter," is a crime of violence.  <u>Id.</u>

Courts use "a variant of this method — labeled (not very inventively) the 'modified categorical approach' — when a prior conviction is for violating a so-called 'divisible statute,'" which "sets out one or more elements of the offense in the alternative." Descamps v. United States, —— U.S. ——, 133 S. Ct. 2276, 2281, 186 L. Ed. 2d 438 (2013). The modified-categorical approach is a "tool" used in a "narrow range of cases" to "identify the relevant element" of which a defendant was necessarily convicted if — and only if — his conviction was under "a statute with multiple alternative[]" elements. Id. at 2287 (internal quotation marks omitted). So where a prior conviction was under a statute that "could be violated in a way that would constitute a crime of violence and in a way that would not," United States v. Rede–Mendez, 680 F.3d 552, 556 (6th Cir. 2012), we may "consult a limited class of documents . . . to determine which alternative [element] formed the basis of the defendant's prior conviction," Descamps, 133 S. Ct. at 2281; see also Shepard v. United States, 544 U.S. 13, 16–17, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005). Where the defendant has pled guilty, these so-called Shepard documents may include the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Shepard, 544 U.S. at 16, 125 S. Ct. 1254. The point of the modified-categorical inquiry is to determine "whether the court documents establish that the defendant 'necessarily admitted' the elements of a predicate offense through his plea." United States v. Medina–Almaguer, 559 F.3d 420, 423 (6th Cir. 2009) (quoting Shepard, 544 U.S. at 16, 125 S. Ct. 1254).

United States v. Denton, ___ F.3d ___, 2013 WL 4558214, at *2 (6th Cir. 2013).

As previously stated, see supra p. 13, Nance had two juvenile adjudications for robbery from the State of Indiana. The statute provides as follows:

A person who knowingly or intentionally takes property from another person or from the presence of another person:

(1)    by using or threatening the use of force on any person; or

(2)    by putting any person in fear;

commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon or results in bodily injury

to any person other than a defendant, and a Class A felony if it results in serious bodily injury to any person other than a defendant.

Ind. Code Ann. § 35-42-5-1 (1986). "Robbery in Indiana is a . . . 'violent felony' under the Armed Career Criminal Act . . . ." United States v. Raupp, 677 F.3d 756, 757 (7th Cir.), *cert. denied,* ___ U.S. ___, 133 S. Ct. 610 (2012); United States v. Lewis, 405 F.3d 511, 514 (7th Cir. 2005). Thus, if Nance had obtained these convictions as an adult, they would properly be counted as predicate offenses.

Nance's juvenile adjudications were properly counted because they involved the use or carrying of a firearm. The Government has filed two Formal Delinquency Petitions, which establish that Nance was charged with committing "Robbery (Class B felony) contrary to I.C. 35-42-5-1." (D.E. 9-2 at 4, 5.)[9] On April 18, 1991, the Juvenile Referee issued an order stating that, "[b]y agreement of the parties, . . . the minor does admit to two (2) counts of Robbery, Class B Felony, contrary to I.C. 35-42-4-1. Adequate factual basis is taken." (Id. at 1.) Nance was adjudicated a delinquent. (Id.) Thus, an examination of the charging document and dispositional order for the Indiana juvenile adjudications establishes that they were properly counted as "crimes of violence" under the ACCA.

Because Nance cannot establish either deficient performance by his attorney or prejudice, the third issue also is without merit.

---

[9] A third Petition charged Nance with a Class D felony. (Id. at 6.) At a hearing on January 23, 1991, Nance "admit[ted] to Theft, Class D Felony, contrary to I.C. 37-43-4-2, involving property of Mark's City Market . . . ." (Id. at 3.)

In his fourth issue, Nance claims that his attorney rendered ineffective assistance by failing to argue that use of his prior juvenile convictions under the ACCA was contrary to Apprendi v. New Jersey, 530 U.S. 466 (2000). (D.E. 4 at 6-8.) Nance contends that, although there is an exception to Apprendi for prior convictions, the Due Process Clause forbids the use of his juvenile adjudications to enhance his sentence because there was no right to a jury trial or proof beyond a reasonable doubt in the juvenile proceeding. (Id. at 7-8.)

This argument has been rejected by the Court of Appeals. In United States v. Crowell, 493 F.3d 744, 750 (6th Cir. 2007), the Sixth Circuit held that "the use of procedurally sound juvenile adjudications as ACCA predicates does not violate due process." In this case, Nance had notice of the charges against him and was represented by counsel. Under Indiana law, "[i]f a child is alleged to be a delinquent child, the procedures governing criminal trials apply in all matters not covered by the juvenile law." Ind. Code Ann. § 31-6-7-1(a) (1978) (currently codified at Ind. Stat. Ann. § 31-32-1-1). Nance chose to admit the substance of the charges. Use of his juvenile adjudications to enhance his sentence under the ACCA did not violate his right to due process or run afoul of Apprendi.

Nance is not entitled to relief on the fourth issue.

In his fifth issue, Nance contends that his lawyer was ineffective by failing to use a peremptory challenge on a prospective juror who had previously dated the prosecuting attorney. (D.E. 18.) The transcript reflects that, prior to jury selection on February 14, 2005, Leigh Grinalds, the prosecuting attorney, stated as follows:

One of the jurors is very well-known to me by the name of Sherry Turner.  She and I dated in college, although she denies it, I think.  At the present she claims she doesn't remember; however, I remember very well.

And she and I have known each other for many years.  She worked for the State of Tennessee — or works for the State of Tennessee, and their offices were next-door to the DA's office.

I also know her daughter very well.

And I've had some contact with her since the jury selection came out because she called me when the telephone system broke down in the clerk's office, and I wound up contacting Your Honor and your secretary and also Ms. Pettigrew looking for how to check the machine.  And I contacted Ms. Turner telling her what to do in terms of when to call back in and that sort of thing.

So I — I'll leave it up to Mr. Mueller as to what he wants to do.

(Sent'g Tr. 2-3, Cr. D.E. 195.)

Under questioning by the Court during *voir dire*, Turner testified that she knew Grinalds.  She stated that "I went to college with Leigh, and I've known him for years."  (Id. at 4-5.)  Turner was asked whether her relationship with Grinalds was always satisfactory, and she responded, "Well, I guess so."  (Id. at 5.)  Turner testified that she had no reason to treat Grinalds differently than she treated defense counsel.  (Id.)  She also stated that she did not owe Grinalds anything.  (Id.)  Further questioning established that Turner was old enough to have a granddaughter.  (Id. at 6-7.)  Defense counsel did not use a peremptory challenge on Turner.

Nance's presentation of this issue does not plausibly establish either deficient performance or prejudice.  Nance does not suggest that the relevant facts about Turner's relationship with the prosecutor were not disclosed.  After hearing Grinalds's statement and

21

Turner's testimony, defense counsel chose not to use a peremptory challenge to strike her. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. "An attorney's actions during *voir dire* are considered to be matters of trial strategy. A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001) (internal quotation marks and citation omitted).

Nance also cannot establish that, if only Turner were not a member of the jury, there is a reasonable probability that the outcome of his trial would have been different. Nance's "claim of ineffective assistance of counsel is grounded in the claim that counsel failed to strike a biased juror. To maintain a claim that a biased juror prejudiced him, however, [Movant] must show that the juror was actually biased against him." Id. at 458; *see also* United States v. Angel, 355 F.3d 462, 470 (6th Cir. 2004) (same). Movant has not satisfied his burden of showing actual bias. United States v. Vasser, 163 F. App'x 374, 377 (6th Cir. 2006). A juror is impartial if she can "render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723 (1961). Turner testified that her relationship with Grinalds would not affect her duties as a juror. Movant has come forward with no evidence of actual bias but, instead, asserts that bias should be presumed. (D.E. 18 at 5.) However, that is not an accurate statement of the law.

The fifth issue also is without merit.

In his first issue, Nance contends that his attorney rendered ineffective assistance by failing to file a motion to suppress and by failing to raise the suppression issue on direct appeal. (D.E. 1 at 4.) In his original motion, Nance did not explicitly address the issue of standing and repeatedly referred to the house as McPhearson's home. Nance stated, in pertinent part, that "his co-defendant Martedis McPhearson did not give the officers consent to enter or search his home. As a matter of fact, he specifically refuse [sic] consent. Furthermore, no exigent circumstances existed that would have justified the officer's failure to obtain a warrant prior to." (D.E. 1-3 at 3; *see also* <u>id.</u> ("the Officeres [sic] conducted a warrantless search of Mr. McPhearson's home ".)

The Government's answer included the affidavit of Nance's trial counsel, Jeff Mueller, who stated, in pertinent part, as follows:

> 3.      Mr. Nance complains that I did not file a motion to suppress. From our first meeting through trial Mr. Nance insisted that he did not live at the address where the search occurred. Further, he always maintained that he did not stay overnight, have personal belongings there, or otherwise have any contact beyond occasionally visiting his friend there.

> His defense at trial centered on this lack of contact with the searched premises. He had no connection to this house or the items which were found there. He was simply present when the search occurred. At trial evidence was admitted that Mr. Nance had handled a gun in the house four days prior to the date of the search. This was crucial evidence at trial and on appeal.

> 4.      Because Mr. Nance had no connection to the house, he did not have standing to contest the search. We reviewed this issue in detail. His co-defendant, who did live there, filed a motion to suppress. After the standing problem was initially explained to him, Mr. Nance made no further requests for a motion to suppress.

(Mueller Aff., ¶¶ 3-4, D.E. 9-1.)

In his reply, Nance submitted his own affidavit and that of his co-defendant, Martedis McPhearson. In his affidavit, Nance stated:

> In December of 2003, I did occaisionally [sic] live at 228 Shelby Street, in Jackson Tennessee, with Mr. Martedis McPhearson. I was there on and off during the day, stayed the night at least three nights a week whenver [sic] I was not at my girlfriend's house, and I had some of clothes and other things there. I informed my attorney, Mr. Jeff Mueller, of these things, but he told me that "it would be in your [my] best interests if we didn't mention that."

(Nance Aff., D.E. 16 at 11.) McPhearson stated that "from July 2003 until December 2003, Elton Nance lived with me at my house, at 228 Shelby Street. He slept there 4 or 5 nights a week, had my permission to stay as long and as often as he wanted, and he also had clothes and other personal belongings there." (McPhearson Aff., D.E. 16 at 12.)

Because of the conflicting facts presented in these affidavits, the Court referred the matter to Magistrate Judge Edward G. Bryant to conduct an evidentiary hearing. After the hearing, Magistrate Judge Bryant issued an R&R recommending that relief be denied on this issue.

The district court has the authority to refer certain pretrial matters to a magistrate judge for resolution. 28 U.S.C. § 636(b)(1)(A). The referral may include dispositive matters such as a motion for summary judgment or a motion for injunctive relief. 28 U.S.C. § 636(b)(1)(B). When a dispositive matter is referred, however, the magistrate judge's authority only extends to issuing proposed findings of fact and recommendations for disposition, which the district court may adopt or not.

The district court has initial appellate jurisdiction over any decision the magistrate judge issues pursuant to such a referral. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72. The standard of review applied by the district court depends on the nature of the matter the magistrate judge considers. If the magistrate judge's order addresses a dispositive motion or prisoner petition, the district court should engage in *de novo* review of all portions of the order to which specific written objections have been made. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(b)(3); United States Fid. & Guar. Co. v. Thomas Solvent Co., 955 F.2d 1085, 1088 (6th Cir. 1992).

A *de novo* review requires the reviewing court to reconsider the matter in its entirety, without granting any weight or consideration to the lower court's decision. "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

It has been established that the search at 228 Shelby violated the Fourth Amendment. Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. Rakas v. Ill., 439 U.S. 128, 133-34 (1978) (internal quotation marks and citations omitted). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Id. at 425. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has a source outside of the Fourth Amendment,

either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Minn. v. Carter, 525 U.S. 83, 89 (1998) (internal quotations marks and citations omitted). Nance "has the burden of establishing his standing to assert a Fourth Amendment violation." United States v. Smith, 263 F.3d 571, 582 (6th Cir. 2001).

If Nance has standing to contest the search at 228 Shelby, his statement to the police in which he admitted to handling a firearm four days before the search may also be suppressed as "fruit of the poisonous tree." *See, e.g.,* Or. v. Elstad, 470 U.S. 298, 305-06 (1985) (stating, in *dicta*, that confessions obtained as a result of an illegal search must be suppressed); Dunaway v. N.Y., 442 U.S. 200, 217-19 (1979) (suppressing confession made after an unlawful arrest); Brown v. Ill., 422 U.S. 590, 604-05 (1975) (suppressing confession made after administration of Miranda warnings because arrest was illegal). The Sixth Circuit has summarized the relevant legal standard:

> The animating purpose underlying the exclusionary rule is the deterrence of unlawful government behavior. Elkins v. United States, 364 U.S. 206, 217, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960) (exclusionary rule's "purpose is to deter — to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it."). The Supreme Court has "declined to adopt a '*per* se, or 'but for,' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." United States v. Ceccolini, 435 U.S. 268, 276, 98 S. Ct. 1054, 55 L. Ed.2d 268 (1978) (citing to Brown v. Illinois, 422 U.S. 590, 603, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975)). Rather, "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." New York v. Harris, 495 U.S. 14, 19, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990).

United States v. Gross, 662 F.3d 393, 401 (6th Cir. 2011). The factors to be considered in assessing whether a confession is an act of free will unrelated to the unlawful arrest are "observance of Miranda, the temporal proximity of the arrest and confession, the presence of intervening circumstances, and particularly, and purpose and flagrancy of the official misconduct." Kaupp v. Tex., 538 U.S. 626, 633 (2003) (internal quotation marks, alteration and citation omitted).

Lieutenant Patrick Willis of the Jackson Police Department testified at trial that, although Nance gave a false name to police when they found him at 228 Shelby, by the time he arrived at the premises Nance's true identity had been determined. (Trial Tr. 90, Crim. D.E. 124.) After the search, Nance "was transported by a patrol unit to the police department." (Id.) He was "processed and placed in a holding cell." (Id.) Willis "signed him out and brought him into what is a courtroom for arraignments where we do our interviews, and I interviewed Mr. Nance." (Id.) Nance signed a rights waiver and gave a written statement. (Id. at 90-91, 93-95.) That statement was admitted into evidence at trial. (Id. at 95-97.) On cross-examination, Willis stated that, at the time of the interview, Nance was being charged with criminal impersonation. (Id. at 100.)

The testimony of Lieutenant Willis makes clear that Nance's confession was the fruit of an illegal search. Had the search not occurred, the police would not have encountered Nance and he would not have given them a false name. Nance's confession was close in time to the search and his arrest. Although he was given Miranda warnings, no intervening

circumstances dispelled the taint of the illegal arrest. Therefore, if Nance has standing to contest the search, his confession is also inadmissible.

The Supreme Court has held that an arrestee's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to regard as reasonable." Minn. v. Olson, 495 U.S. 91, 96-97 (1990). A transient visitor who is present for commercial reasons has no reasonable expectation of privacy in the premises. Minn. v. Carter, 525 U.S. at 90-91. The Supreme Court explained that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." Id. at 90.

Applying these standards, the Sixth Circuit has held that an individual who knew the lessee of the premises, occasionally spent the night on the living room couch, occasionally ate meals with the family, and kept some personal belongings on the premises had standing to contest a search. United States v. Pollard, 215 F.3d 643, 647-48 (6th Cir. 2000); *see also* United States v. Heath, 259 F.3d 522, 533 (6th Cir. 2001) (arrestee had standing to contest the search of his cousin's apartment where he slept on the couch once a week for two years and had a key to the apartment); United States v. Sanzineto-Miranda, 859 F.2d 1501, 1510 (6th Cir. 1988) (visitor to apartment who had a key, was afforded unrestricted access, sometimes spent the night, and kept personal belongings at the apartment had standing to challenge a search). On the other hand, a family relationship with the property owner or lessee coupled with an arrestee's presence in the premises at the time of the search is

insufficient to confer standing.  United States v. Buckner, 717 F.2d 297, 300 (6th Cir. 1983) (arrestee lacked standing to challenge the search of his mother's apartment).

In conducting a *de novo* review of the R&R, the Court first notes that there is no evidence that defense counsel was unaware of the aforementioned legal standards.  Mueller, who had seventeen years of experience as a criminal defense attorney, much of it in federal court (Evid. Hr'g Tr. 167, D.E. 49), testified that he understood the concepts of standing and the right to privacy and discussed those issues with Nance (id. at 170).  Mueller testified as follows:

> Q.     Did you tell Mr. Nance that unless he had bills and mail coming to him at 228 Shelby Street that he did not have standing unless he had those things coming to his residence?

> A.     No, I wouldn't tell that to any defendant.  Certainly, that would help with standing, but I wouldn't tell him that he didn't have standing.

> Q.     And I don't want to insult your intelligence as to the basic understanding of standing or right to privacy at all, Mr. Mueller, but there are many other factors that could establish standing or right to privacy.  Isn't that correct?

> A.     Yes, sir.

> Q.     And you would have inquired into those things, wouldn't you?

> A.     Yes, sir.

> . . . .

> Q.     What sort of things would you have asked about?

> A.     If he had been an overnight guest, quote, unquote, on one or many occasions.  How often he had done that in the time within the last several months leading up to that particular alleged offense date.  If he kept property

there.  If he shared some kind of business there.  Shared some kind of other
property there, or some other interest in that particular property.

Those things are predicated on basically the time you spend there
and the property you have there.

(Id. at 176-78.)  On cross examination, Mueller testified that "I'm sure when we talked about
his connection to the house we talked about things like mail, and we talked about him
spending the night, and having things there, and those kinds of issues."  (Id. at 192-93.)  He
also acknowledged that, if Nance had the ability to come and go as he pleased and kept
personal belongings in the house, that "would certainly be evidence he would present in
support of [a] motion [to suppress]."  (Id. at 199.)

Given that there is no question that counsel was familiar with the relevant law,
Nance's ineffective assistance claim can succeed only if he shows either that defense counsel
failed to conduct an adequate factual investigation or that counsel made an unreasonable
strategic decision.  As previously noted, Mueller submitted an affidavit stating that, "[f]rom
our first meeting through trial, Mr. Nance insisted that he did not live at the address where
the search occurred.  Further, he always maintained that he did not stay overnight, have
personal belongings there, or otherwise have any contact beyond occasionally visiting his
friend there."  (Mueller Aff. ¶ 3.)  Mueller's testimony during the suppression hearing
reiterated that point.  Mueller recalled that Nance was not interested in a plea deal because
he did not think he was guilty of the gun charge.  (Id. at 169.)  As Mueller understood it,
Nance's reasoning was that it "wasn't his gun, wasn't his house, wasn't a place where he —
he would visit there, but he never was — never lived there, never stayed the night, never had

any connection to, and felt that it was just wrong that he would be pleading to something like that." (Id. at 169-70.)

Mueller testified that he discussed the standing issue with Nance. (Id. at 170.) He stated:

> [F]rom the beginning of his case when I first met with him, he was informing me that he didn't live there, didn't stay there, doesn't have any connection with that, doesn't know why he's getting caught up in McPhearson's problems. He just felt like he was at the wrong place at the wrong time.
>
> And that is why I — I took him at his word and followed up on that. And knowing that he has no connection, not a serious enough connection to form any standing for a motion, I never, never brought any Motion to Suppress knowing that he did not have any connection that would establish standing.

(Id.; see also id. at 171 ("From the first time I met him, like I say, on through the end of trial his position to me was that he did not live there, did not have anything . . . . And but his point was that he didn't live there, he didn't possess any of those items, didn't own any of those things that were there, and that he shouldn't be caught up in the other person's problems. And we had, I don't know, two or three day trial on that.").)

After McPhearson's motion to suppress had been granted, Mueller recalled that "I think he had mentioned that, boy, he wished he had done a Motion to Suppress. And we, once again, discussed the standing issue, but never — never changed what he was telling me about whether or not he spent any real time there at that particular residence." (Id. at 172.)[10]

---

[10] Movant objects to the R&R insofar as it suggests that Nance never raised the issue of a motion to suppress with his attorney until after the ruling on McPhearson's suppression motion. (D.E. 54 at 2-3.) It is clear from the § 2255 hearing transcript that Mueller and Nance discussed factors relevant to Nance's standing to make a suppression motion before McPhearson's motion was granted. It is unclear from the hearing transcript whether that discussion was explicitly phrased in terms of a motion to suppress or whether it was part of the general discussions about the relevant facts and defense strategy.

Mueller insisted that he would have filed a motion to suppress had Nance asked him to. (Id. at 178.) Mueller believed that Nance's present position arose because he "saw what his codefendant got and he wanted some of that too." (Id. at 173-74.)

Nance's testimony about what he told Mueller differs from Mueller's testimony. At the evidentiary hearing, Nance testified that he told Mueller "that I lived at the house with Martedis most of the time." (Id. at 101.) According to Nance, Mueller "said it would be best if I didn't mention that, or it would in my best interest if we didn't mention it, or something like that. And — but I never told him I had nothing to do with that house. Anybody that knows me and Martedis would know that I would never say anything like that." (Id. at 101-02; *see also* id. at 104 ("I told him from my first meeting that I lived there most of the time, that I have got clothes, that I have clothes in the house. I told him that. He told me that it was best that we didn't mention that, or something like that.").) Nance testified that Mueller told him that a motion to suppress would be "frivolous" (id. at 103), and he also testified as follows:

> He asked me if I had any mail, if I could prove that I lived at the house. If I had any mail that came to the house. And I told him, no, I did not have any mail coming to the house. He asked me if I had — do I pay any bills? Are the bills in my name? I told him, no.
>
> And he said, well, if you can't show that you actually lived there through mail or through the payment of bills or something physical, then Judge Todd was not going to grant the suppression hearing [sic].

(Id.) Nance said that he assumed that Mueller knew what he was talking about. (Id. at 103-04.) Nance also testified that he asked Mueller to file a suppression motion. (Id. at 107.)

Faced with that conflicting testimony, Magistrate Judge Bryant concluded that Mueller was more credible than Nance on these matters. (R&R, D.E. 52 at 6-8.) Although the Court has not had the opportunity to observe the live testimony, a *de novo* review of the transcript of the evidentiary hearing and of the record as a whole fully supports that conclusion. There is no reason to doubt Mueller's testimony that he would have filed a motion to suppress if Nance had asked him to and if Nance had told Mueller of the facts Nance testified to at the evidentiary hearing. As discussed at the evidentiary hearing, Mueller filed a motion *in limine* to suppress Nance's statement to Willis. (Evid. Hr'g Tr. 117, 121-23, D.E. 49; *see* Cr. D.E. 92 at 1-2; Trial Tr. 4-7, Cr. D.E. 124.)

On the other hand, there is ample reason to question Nance's credibility. When Nance encountered the officers at 228 Shelby, he lied to them about his identity, giving his name as Marcus Powell. (Id. at 86-87.)[11] That was not the first time Nance has lied about his identity. His PSR reflects three prior convictions for criminal impersonation. (PSR ¶¶ 26, 27 & 29.)[12] When he gave his statement to Willis after his arrest, he listed his address as 1407 Mitchell, which, from Nance's current perspective, was inaccurate.[13] The content of the statement, in which Nance explains why his fingerprint might be on the firearm found at

---

[11] That was not a fictitious name. Marcus Powell was the name of the victim in Nance's conviction for facilitating aggravated robbery, one of the crimes used to qualify him as an armed career criminal. (PSR ¶ 30.)

[12] Nance pled guilty to a fourth charge of criminal impersonation for his use of a false name, social security number, and date of birth when he was questioned by police at 228 Shelby. (PSR ¶ 32.)

[13] A copy of this statement, which is found at D.E. 51-1, was admitted at trial as Exhibit 6. (Trial Tr. 93, Cr. D.E. 124.) At the evidentiary hearing, Nance testified that he planned to move into an apartment at 1407 Mitchell but had not yet done so when he was arrested. (Evid. Hr'g Tr. 92-93, 100, D.E. 49.)

the residence, suggests that even at that early date Nance was concerned about the possibility of a felon in possession charge and wanted to distance himself from the premises. The Court also agrees with the Magistrate Judge that it "defies commonsense" to believe that Mueller knew that it might be helpful to subpoena Ebony Donald and to question her about Nance's living arrangements without the knowledge and cooperation of Nance. (R&R, D.E. 52 at 7-8; *see* Trial Tr. 82, 83-84.)[14]

Finally, the Magistrate Judge's conclusion that Mueller is more credible than Nance is not clearly erroneous in light of the nature and combative tone of Nance's answers on cross-examination at the evidentiary hearing. If Nance were correct that his attorney disregarded his statements that he lived at 228 Shelby and insisted that the case be tried on a theory that was factually erroneous, he would, of course, have reason to be unhappy. Instead, Nance took the position that he "wanted to go to trial," but he "never discussed defensive strategy" with Mueller and was unaware that Mueller's trial strategy was to distance him from 228 Shelby. (Id. at 127; *see also* id. at 138 (denying that Mueller told him his strategy was to prove that Nance "did not live there or . . . had less to do with this house as possible").) Nance admitted that Mueller came to see him, but claimed not to recall what they talked about. (Id. at 129.) He admitted they discussed whether Nance should testify. (Id. at 130-31.) They also discussed whether the defense should call witnesses. (Id. at 131.)

---

[14] In his objections to the R&R, Movant states that "[i]t is unclear from the trial transcript whether [Ebony Donald] testified that Mr. Nance lived in the house." (D.E. 54 at 2.) Although it does not come across clearly in the trial transcript, where Donald answered two questions with "[h]um-um" and "[u]m-hum" (Trial Tr. 84, Cr. D.E. 124), it was clear at trial that Donald testified that Nance did not live at 228 Shelby but that he frequently visited McPhearson in his home.

When asked what those witnesses were going to say, Nance responded, "I can't speculate as to that. I don't know what Mr. Mueller was going —" (Id.) Nance did not concede that Ebony Donald testified that Nance did not live at 228 Shelby. (Id. at 123 ("Yes, I remember when she said uh-huh or uh-uh or something like that.").) These factors, taken as a whole, fully support the Magistrate Judge's conclusion that "Mr. Nance now has 'buyer's remorse' only after the success of his co-defendant McPhearson, who actually lived at 228 Shelby Street." (R&R, D.E. 52 at 8.)

Even if it were assumed that one or more of the witnesses who testified on Nance's behalf at the evidentiary hearing would have testified at a suppression hearing had a motion been filed on Nance's behalf, Mueller's decision to rely on Nance's representations to him is not professionally unreasonable. As the Supreme Court has stated:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to

believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Strickland v. Washington, 466 U.S. at 690-91; *see also* Goldsby v. United States, 152 F. App'x 431, 435 (6th Cir. 2005) ("Defense attorneys do not have an absolute duty to investigate. The Strickland Court held that counsel could discharge the duty to investigate with a reasonable decision that makes particular investigations unnecessary." (internal quotation marks and citation omitted)); Sutton v. Bell, No. 3:07-cv-30, 2011 WL 4595801, at *36 (E.D. Tenn. Sept. 29, 2011) ("defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation").[15]

Finally, it was not an unreasonable strategic decision to forego the filing of a motion to suppress and, instead, to try the case with a strategy of distancing Nance from 228 Shelby. Viewed in hindsight, that strategy was partially unsuccessful, as Nance was convicted of violating 18 U.S.C. § 922(g). Nance was acquitted of the drug-trafficking charge arising from the crack cocaine in McPhearson's pocket and of the § 924(c) charge. However, it is important to recall that this Court's decision on McPhearson's suppression motion did not issue until three days before Nance's trial, and the decision of the Court of Appeals affirming that decision was issued in 2006, after Nance had been tried and convicted. The decision on

---

[15] Cases in which the Court of Appeals has held that defense counsel acted unreasonably in relying on the representations of their clients arose in the penalty phase of death penalty cases. *See, e.g.,* Hamblin v. Mitchell, 354 F.3d 482, 492-93 (6th Cir. 2003). In Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1406-07 (2011), the Supreme Court held that the Ninth Circuit misapplied Strickland when it found that it was *prima facie* ineffective for counsel to abandon an investigation of mitigating evidence based on a rudimentary knowledge of the client's background.

the suppression motion, and on whether the police were entitled to rely in good faith on the affidavit of probable cause, presented close questions, as demonstrated by the dissent in the Sixth Circuit on the Government's appeal of the decision on McPhearson's suppression motion. It was not clear, at the time of trial, that even McPhearson would ultimately prevail on the motion to suppress.

As to Nance, there was a substantial risk that the Court would have concluded that he lacked standing to challenge the search. As noted at the evidentiary hearing, Nance did not receive his mail at 228 Shelby, and there was no proof that he paid any of the household bills. He also had told the police at the time of his arrest that he lived at 1407 Mitchell. There is a significant likelihood that Nance would not have been called to testify at a suppression hearing because of his previous statement and his history of using false names and identity theft. Defense counsel also might be reluctant to have Nance testify because of the risk that, had the Court disbelieved his testimony, he would have risked a sentence enhancement for obstruction of justice or a subsequent perjury prosecution. For similar reasons, there is no assurance that McPhearson would have agreed to testify at a suppression hearing on Nance's behalf. Without the testimony of Nance and McPhearson, there is a fair likelihood that the Court would not have found the vague and equivocal testimony of the remaining witnesses sufficient to satisfy Nance's burden of demonstrating standing.

The decisions to file a suppression motion and to distance Nance from the premises at trial were, as a practical matter, mutually exclusive. Had Nance testified at the suppression hearing, his statements could have been used during cross-examination at trial if Ebony

Donald testified that Nance did not live at 228 Shelby.  The Government could have called at trial the various witnesses Nance produced at the evidentiary hearing, which would have eviscerated any attempt to distance Nance from 228 Shelby and the firearm found therein.[16]  Thus, a decision to file a suppression motion would have been, essentially, an all-or-nothing decision to take a chance that the Court would believe that Nance lived at 228 Shelby with McPhearson rather than at the address he provided to police when he was arrested.

Finally, the trial record shows that Mueller had a well-developed, although unsuccessful, strategy to distance Nance from 228 Shelby Street.  Count Six of the second superseding indictment charged Nance with possessing a firearm on or about December 12, 2003.  (Cr. D.E. 54 at 6.)  Before trial, defense counsel filed a motion *in limine* to suppress Nance's statement to the police on the ground that Nance's admission that he handled a gun in McPhearson's home four days prior to the search was irrelevant and unduly prejudicial.  (Cr. D.E. 92 at 2; *see also* Trial Tr. 5-6, Cr. D.E. 124.)  The Court denied the motion because, *inter alia*,

> the indictment alleges that 'on or about' December the 12th.  It was four days earlier, allegedly.  The jury will be told that the date alleged in the indictment does not have to be proven that it happened on that exact date but reasonably close to that date.  And it seems to me that four days earlier is reasonably close.

(Trial Tr. 7.)  Nance raised that issue on direct appeal and, although the Court's ruling was affirmed, the Court of Appeals stated that

---

[16] Nance's attempt to distance himself from the drugs found in McPhearson's pocket also would have been weakened.

> [t]he government's obligation was to prove the particular possession charged, not some earlier occasion of possession. The 'on or about' language permits the jury to conclude that the offense charged occurred on some date reasonably close to the one contained in the indictment, but does not permit conviction of an uncharged offense that occurred in close temporal proximity to the charged offense.

United States v. Nance, 481 F.3d at 886 n.2 (citation omitted). One member of the panel dissented, stating that he would reverse Nance's conviction because he "strongly believe[d] that there is a substantial likelihood that Nance was convicted of a crime other than the one charged in the indictment . . . ." Id. at 889 (Holschuh, J., concurring in part and dissenting in part).

The admittedly inarticulate testimony of Ebony Donald is not the only evidence introduced at trial that Nance did not live at 228 Shelby. The Government called Investigator Charles Mathis of the Jackson Police Department to testify to the search at 228 Shelby Street and the arrest of Nance. On cross examination, the following exchange occurred:

Q. And you were there to arrest McPhearson; right?

A. Yes, sir, the first time.

Q. And it was his place.

A. Yes, sir.

Q. Do you have any knowledge of Nance having anything at that residence?

A. I didn't know Mr. Nance was even there.

Q. You all didn't even know Mr. Nance; right?

A. No, sir, I didn't know him.

39

Q.      For quite a while you all had thought he was someone else, whose name I forget right now, but some other name he had given you.

A.      Yeah.  I wasn't there then.  I was gone, but —

Q.      And you never recovered any personal items, clothes or anything of Mr. Nance's; right?

A.      Not to my knowledge.

(Trial Tr. 66, Cr. D.E. 124.)

During opening and closing argument, Mueller also argued, at length, that Nance was only a visitor to 228 Shelby and was not responsible for the firearm seized during the search. (Supp. Trial Tr. 5, 14, 15, 19, Cr. D.E. 137.)  The Government did not highlight the evidence noted by Nance in this § 2255 proceeding that tended to undercut this defense, including the use of the word "home" in Nance's written statement.  (*See* id. at 20-22.)[17]

For the foregoing reasons, the Court OVERRULES Nance's objections to the R&R and ADOPTS the conclusion of the Magistrate Judge that Nance's first issue does not entitle him to relief under § 2255.

---

[17] In his objections to the R&R, Movant notes that "Mr. Mueller admitted at the hearing that he was not aware of any evidence he presented at trial to establish that the Defendant lived anywhere other than 228 Shelby Street." (D.E. 54 at 3.)  At the evidentiary hearing, Mueller testified that his memory of the events was less than clear because of the passage of time and because he no longer had his file.  (Evid. Hr'g Tr. 166, 167, 181-84, D.E. 49.)  In response to whether he put on proof that Nance did not live at 228 Shelby, Mueller stated, "I have not read the transcript and I don't recall specifically, but I would think that we would have asked questions about that."  (Id. at 186.)  Mueller went on to discuss the testimony of Ebony Donald as an example of evidence he presented.  (Id.)  The exchange cited by Movant refers to a follow-up question about whether Mueller presented evidence that Nance was living at another address.  (Id. at 186-87.)  It is unnecessary to address whether defense counsel could have done a better job of showing that Nance lived somewhere else because Nance has not raised that issue.

Because the Court has determined that none of the issues presented by Nance are sufficient to warrant relief, his motion pursuant to 28 U.S.C. § 2255 is DENIED in its entirety.

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue(s) which satisfy the required showing. 28 U.S.C. § 2253(c)(2)-(3). A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted); *see also* Henley v. Bell, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. Miller-El, 537 U.S. at 337; Caldwell v. Lewis, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. Bradley v. Birkett, 156 F. App'x 771, 773 (6th Cir. 2005).

In this case, because reasonable jurists could disagree about the resolution of Claim One, the Court GRANTS a limited certificate of appealability on that issue. However,

reasonable jurists could not disagree about the resolution of Claims Two through Five; therefore, the Court DENIES a certificate of appealability on those issues.

The Sixth Circuit has held that the Prison Litigation Reform Act, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions. Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the $455 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the Defendant must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). Kincade, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a)(3) provides that if a party was permitted to proceed *in forma pauperis* in the district court, he may also proceed on appeal *in forma pauperis* without further authorization unless the district court "certifies that the appeal is not taken in good faith or finds that the party is not otherwise entitled to proceed in forma pauperis."

In this case, because the Court has granted a limited certificate of appealability, it is also CERTIFIED, pursuant to Fed. R. App. P. 24(a), that an appeal in this matter by Movant as to that issue would be taken in good faith. Leave to appeal *in forma pauperis* is, therefore, GRANTED.

IT IS SO ORDERED.

 s/ **James D. Todd**                          
JAMES D. TODD
UNITED STATES DISTRICT JUDGE